Mary McNamara, SBN 159859
Nathan Bays, SBN 291432
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant JOHN CLIFFORD POLLARD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>     vs.<br><br>JOHN CLIFFORD POLLARD,<br><br>               Defendant. | No.    CR 13-722 WHO<br><br>**DEFENDANT JOHN CLIFFORD POLLARD'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE** |

## **<u>Table of Contents</u>**

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT .......................................................................................................3

    A.      Factor (1) The Nature of the Offense & Mr. Pollard's History and
            Characteristics....................................................................................................3

        (i)      Traumatic Childhood and Adolescence ............................................3

        (ii)     The Businesses – Hard Work, But No Structure ................................5

        (iii)    Check Kiting During the 2008 Financial Crisis..................................6

        (iv)     Rehabilitation ..................................................................................8

    B.      Factors (2), (4), (5) & (6)  Retribution, Deterrence and the Avoidance of
            Disparity -- All Served By a Probationary Sentence Which is Permitted By
            The Sentencing Guidelines and Policy Statements.................................14

        (i).     Punishment and Deterrence ..........................................................14

        (ii).    No Unwarranted Disparity Occurs from Imposition of Probation in this
                 Case...........................................................................................16

    C.      Factor (3) Probation Is Both Statutorily Available And Readily
            Permissible Under the Guidelines..............................................................19

        (i)      A Non-Custodial Sentence Constitutes A Modest Variance Well-
                 Supported By Case Law................................................................19

        (ii)     Imposition Of A Community Service Requirement Is Appropriate. ..............19

    D.      Factor (7) Only A Probationary Sentence Satisfies The Need To Provide
            Restitution ......................................................................................................21

III.    CONCLUSION...................................................................................................22

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

## <u>Table of Authorities</u>

### Cases

*United States v. Gand*, 829 F. Supp. 699, 671 (S.D.N.Y. 1993) ...................................................15

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) .................................................15, 19

*United States v. Olenicoff*, Case No. 07-227 (C.D. Cal. 2008)..................................................18

*United States v. Pflum*, 556 F. Supp. 2d 1254 (D. Kan. 2008) .............................................passim

*United States v. Reiss*, Case No. 11-668 (S.D.N.Y. Jan. 11, 2012)............................................18

*United States v. Shamilzadeh*, Case No. 04-CR-194 (E.D.N.Y. 2008) ......................................21

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2008) (en banc) ..........................................passim

*United States v. Warner*, Case No. 13-CR-00731 (N.D. Ill. 2014) ...........................................18

### Statutes

18 U.S.C. § 3553(a) ................................................................................................3, 14, 16, 18

### Other Authorities

ADMINISTRATIVE OFFICE OF THE U.S. COURTS, OFFICE OF PROBATION & PRETRIAL SERVICES,

   *Court & Community* (2007). ...................................................................................................20

## I. INTRODUCTION

Instead of the three months in custody and one year of supervised release recommended by the PSR, the defense requests a sentence of two years' probation, with a condition of full repayment of restitution within that period, and a requirement of 150 hours of community service. Avoidance of unwarranted disparity is an important sentencing purpose, but it is not served by imposing a three month prison term on Mr. Pollard. Mr. Pollard's case is outside the heartland for the following reasons:

First, as the PSR rightly recognizes, childhood abuse and neglect is an appropriate ground for variance. Mr. Pollard's childhood left him unprepared for the world of business compliance, ignorant of the need for professional direction, and suspicious of authority, all of which fed directly into the offense conduct.

Second, Mr. Pollard has already executed a full program of post-offense rehabilitation, as follows:

- Sold or is selling real estate assets, including his personal residence, to pay restitution. On May 8, 2014, Mr. Pollard paid $100,000 toward his restitution obligation and agreed to pay $25,000 each subsequent quarter, starting on June 30, 2014, until fully repaid – a process that will take two years. This restitution also rectifies the harm to the employees by covering their tax obligations incurred through Mr. Pollard's failure to withhold. PSR, ¶ 10.

- Affirmatively contacted IRS to pay tax on years that are beyond the reach of the criminal case. His debt to the government will take him the rest of his working life to satisfy.

- Hired a credentialed CPA with power to comply with tax laws (the offense-era bookkeeper was not empowered to challenge inappropriate practices)

- Hired a business manager with a legal and tax background who has properly classified workers as employees

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

- Placed the companies on payroll deduction via an outside payroll company with timely payroll tax filing so that Mr. Pollard can never put his businesses' need for survival over the requirement that he withhold payroll tax for his workers
- Spearheaded the sale of real estate assets to pay off debts
- Filed all tax returns through the 2012 tax year

Third, Mr. Pollard employs over forty workers, and imprisonment, even for a short time, would wreck the businesses, causing all of the workers to lose their jobs.

Fourth, Mr. Pollard financially supports both of his elderly parents, who otherwise would struggle to remain off the streets. He also supports his two much younger half-brothers, whose education would follow Mr. Pollard's own sad history, but for Mr. Pollard's having assumed financial responsibility for them. He also donates his time and labor to the community in building and maintaining a shelter for homeless women, working with San Francisco City youth programs and donating money to his former school.

Other Courts have granted downward variances to probation based on the presence of only some of these factors **and** based on the practical need in tax cases to find a way that the defendant can pay the restitution that he owes. Mr. Pollard will be digging himself out of the enormous financial hole that has dug for himself for the rest of his working life, but he can do it. A sentence of probation with a condition that he repay all of the remaining $206,854 in restitution in the IRS civil closing letter is no easy sentence. And, Mr. Pollard will have to deal with the collateral consequences of this felony conviction. All of Mr. Pollard's contractor's licenses are now in jeopardy by virtue of his convicted felon status. He will lose clients who view federal tax trouble in their contractor as a red flag. He will never be able to contract with the federal government, and state and local government business is likely to dry up as well.

Mr. Pollard is not a scofflaw, but rather an honorable person who simply never was schooled in compliance. The PSR notes that he is contrite and takes full responsibility for his misconduct. PSR, Justification, page 2. Since this criminal investigation and prosecution, he has

2

hired professionals, gotten the correct advice, and complied with that advice without reservation, even when it meant selling his home and every other asset he has spent a lifetime accumulating.

## II.    ARGUMENT

Every one of the factors set forth in 18 U.S.C. § 3553(a) supports a non-custodial sentence.

### A.    Factor (1)    The Nature of the Offense & Mr. Pollard's History and Characteristics

#### (i)    Traumatic Childhood and Adolescence

The PSR ably details Mr. Pollard's childhood. [1]  Mr. Pollard's failure as an adult is that he ran his businesses the same way that he endured his childhood— he was focused on survival, but blind to the need for structure, and he had a deep suspicion of authority.

That the childhood neglect led to the adult conduct is clear.  Mr. Pollard had no guidance whatsoever.  His parents ricocheted between abandonment and active abuse.  In the grip of various fads, from Hippie mysticism to EST, the parents deserted Mr. Pollard, who is their eldest child.  Mr. Pollard's mother, who viewed poverty as a political good, and was later diagnosed as bipolar, moved to New York leaving him in the nominal care of his father.  PSR, ¶¶ 39-41; Bays Decl., Ex. A (Letter of Jonathan Powell).  The father let electricity and gas service lapse in the dead of the New Hampshire winter.  He left his young son to fend for himself in everything from clothing to feeding himself to getting to school miles down a country road.  PSR, ¶ 42.  Mortified by his father's conduct with girls not much older than himself, Mr. Pollard was isolated at school and never fit in.  PSR ¶¶ 41, 52; Bays Dec. Ex. B (Personal Statement of John Clifford Pollard). The father had eight children with four different women.  Bays Decl., Ex. A (Letter of Jonathan Powell).  Mr. Pollard became an angry and suspicious child and was unable to follow the rules.

---

[1]  To the extent not listed in the PSR, the details of Mr. Pollard's childhood and personal history are verified in letters written to the Court and attached to the accompanying Declaration of Nathan Bays in Support of Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance ("Bays Decl.").

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

Were it not for the kindness of one teacher, Jonathan Powell, Mr. Pollard would never have

known a nurturing moment in his childhood.  Mr. Pollard has profound gratitude for Mr. Powell

and believes, with good reason, that he saved his life.  PSR, ¶ 41.  Mr. Powell remembers Mr.

Pollard as a child who

> had issues with authority and soon developed a reputation as a bad kid, high energy
> and hard to control…   His father . . . eventually fathered eight children with four
> women. . . .. I can remember six houses that they lived at.  Furnishings were spare,
> food, heat and clothing were uncertain . . ..

> When John's mother moved away, his father was not able to provide full-time day
> care, and I stepped in to fill the gap. . . .  I became sort of an uncle to him.

Bays Decl., Ex. A.

Despite his kindness, Mr. Powell was not a parent and could never provide Mr. Pollard

with a structured or stable childhood.  At the age of 7, Mr. Pollard was fending for his own basic

necessities.  By the age of 13, he was living alone.  PSR, ¶¶ 40-41.  Leah Caitlin Pollard, one of

Mr. Pollard's younger sisters, summarizes Mr. Pollard's childhood as follows:

> We all had a very difficult life in our family but I have always thought that my
> brother had it the worst because when he was 13 he neither lived with my mother
> nor father, which is a terrible way to live as a young man.  . . . our own mother
> suffers from severe mental illness and was unable to care for him after nine years
> old.  He suffered much abuse and neglect at the hands of both parents.

Bays Decl., Ex. C (Letter of Leah Caitlin Pollard).

Mr. Pollard was expelled from one school and then another.  He never graduated or

received a GED.  PSR, ¶¶ 42, 55.

If he was angry and rebellious, the young Mr. Pollard found an outlet in hard, physical

labor.  He made friends with a neighbor boy and helped the boy's family with construction

projects in exchange for meals.  That inculcated in him a strong work ethic that persists today.

By his mid-teens, he was a construction laborer and began to run his own business.  PSR, ¶¶ 41-

42. He has been working with his hands ever since.  He is now 47 years old and has almost

twice the working history of most men of his age.  *Id.*, Identifying Data, page 2.

Courts have considered childhood, upbringing, and parental influence persuasive factors

4

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

in granting non-custodial sentences for defendants in comparable tax offenses.  *See, e.g., United States v. Pflum*, 556 F. Supp. 2d 1254 (D. Kan. 2008) (granting variance and imposing non-custodial sentence for defendant who failed to pay more than **$200,000** in taxes, where defendant had been deeply influenced by his father, a tax protester).  As the court in *Pflum* explained, under strikingly similar circumstances, "the defendant's father heavily influenced the defendant's opinions and actions with regard to his personal financial decisions, including the filing of tax returns and payment of federal taxes.... [This] is not a defense to the charges of tax evasion, but it is a mitigating circumstance that distinguishes this case from the mine run of tax evasion cases." *Id.* at 1263-64.  Mr. Pollard's parents' neglect left him without any foundation to comply with authority – the thing learned first from parents and reinforced through formal education.  But Mr. Pollard had no parents, which in turn doomed him to isolation and expulsion from formal education.  Lacking the vital foundation of a decent and stable upbringing, he simply ignored the administrative and compliance demands of his business and steam rolled ahead with the work.

### (ii)    The Businesses – Hard Work, But No Structure

When Mr. Pollard moved to San Francisco, he started SF Garage, a company with expertise in garage installation and retrofitting.  It is a highly technical business involving subterranean excavation and installation/retrofitting of garages in an earthquake zone.  It is one of only two companies in the San Francisco area that specialize in such work.  PSR, ¶ 57.  To complement the garage work, Mr. Pollard later started several additional companies, including an engineering firm, a larger development company, a special inspection company, and SF Eco Works, a radiant heating and solar company.  *Id.*  Mr. Pollard did all of this single-handedly.  He had no family support, no education, no money.  What he did have was uniformly described as "a phenomenal work ethic" (Bays Decl., Ex. D, at 2 (Letter of Veera Mylapore)), regularly working 14 hour days, seven days a week (Bays Decl., Ex. E, at 2 (Letter of Christine Wade)).  He taught himself all the trades.  He acquired a host of specialty contractors' licenses, from a Class A license in engineering, to concrete, electrical, heating and plumbing and general

construction.  PSR, ¶ 56.  As Susan Dyment, the Director of College Guidance at Mr. Pollard's old school, The Sant Bani School, states:

> [T]hrough discipline, energy and natural talent, John went from a high school drop-out and manual laborer to a businessman and philanthropist.  . . .

Bays Decl., Ex. F.

Mr. Pollard was good at the construction planning, labor, and client development aspects of the work.  He was profoundly bad at the administration, tax compliance and financial aspects of the business.  As Jonathan Powell, who remains a good friend and frequent visitor, observed:

> On job sites, he gives direction to each employee and listens to the problems that they encounter, finding solutions and juggling all the pieces so that they fit together….
>
> I believe that John's legal difficulties came from trying to make things work for his employees and his customers, without having the sophistication to recognize competent advice or to fully understand the imperatives of the tax laws.

Bays Decl., Ex. A.

Mr. Pollard also blurred lines with his employees, borrowing money from one to pay for business supplies, maxing out the employee's credit card and failing to promptly repay the debt.  PSR, ¶ 10 (that debt has since been paid off in full).  Mr. Pollard unreservedly admits all of this: "I did a terrible job of meeting my responsibilities for taxes, paperwork, [and] making sure that the books were in order….  That was a huge mistake and one that I feel terrible about."  Bays Decl., Ex. B. [2]

### (iii)    Check Kiting During the 2008 Financial Crisis

With the businesses already in administrative chaos, the employees improperly classified and their payroll taxes neither paid nor withheld, the 2008 financial crisis nearly dealt a death

---

[2]    During the presentence process, Mr. Pollard underwent counseling with Tom Caldarola, MFT (PSR ¶ 56 lists the name as "Caladora," thus the inability to locate on internet search) and is now in treatment with Fiachra O'Sullivan, MFT.

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

blow.  Bays Decl., Ex. B.[3]  This is when Mr. Pollard engaged in the seemingly senseless check floating conduct that resulted in numerous fees and little benefit to him.  PSR, ¶ 13 ("The case agent further advised that Pollard's transfer of funds and check cashing practices caused the defendant to incur numerous fees.  Therefore, it is unclear as to why the defendant engaged in such activities.").

There was, however, some method to the madness.  To try to bridge the gap between his clients' slow pay on the construction projects[4] and Mr. Pollard's outgoing business expenses, Mr. Pollard would arrange to have checks written in the names of employees, which he did not immediately have bank funds to meet.  The purpose was not to pay the employees, or engage in tax fraud of any kind, but rather, to float the checks until his clients paid him.  The checks would be immediately cashed at Fast Cash, an instant cash checking service in order to cover operating expenses.  Mr. Pollard would arrange to deposit the instant cash from the Fast Cash receipts to one of his business banks in order to pay business bills.  Once he received payments from his construction clients, he would arrange to rush them to the banks for deposit, in the hope that the checks previously cashed at Fast Cash would be covered.  PSR, ¶ 9.

Somewhat remarkably, there were only two instances where the float did not work, i.e., where the client payments did not come in on time to back up the previously-cashed Fast Cash checks (PSR, ¶ 8 – two occasions at Bank of Marin in the amount of $91,800).  But even on those occasions, the bank was repaid fully.  No bank suffered any loss as a result of this conduct

---

[3]     As Mr. Pollard explains in his personal statement, "in 2008, with the world ending … we began having serious problems with clients owing us huge amounts of money, our sub-contractors not able to complete their work on our projects, our suppliers not able to get us supplies because of their cash crunch, and our employees who had bought homes began not being able to make payments, which led us to the past five years of being barely able to survive and sometimes wishing we had not survived."  *Id.*

[4]     Mr. Pollard's business attorney, Christine Wade, describes an onslaught of problems wrought by the Great Recession, from the often meritless construction defect suits brought against Mr. Pollard as a pretext to avoid paying him, to the costs of resolving those suits and the dip in value of some of Mr. Pollard's real estate investments when the credit markets seized up. *See* Bays Decl., Ex. E at 1-2.

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

and Mr. Pollard has not been criminally charged with it.

Mr. Pollard's check kiting conduct was clearly both unlawful and an abuse of power over his employees. But, unlike the payroll tax violations, it had no effect on the employee's taxes, did not cause any of them to incur tax obligations and it had nothing whatsoever to do with this payroll tax case. PSR, ¶ 14 ("From all available information, Pollard's check kiting incidents appeared to be a separate uncharged issue from his misrepresentations and/or unpaid quarterly employer taxes in this matter.") This may be difficult to appreciate at first because the check floating was indeed done through the ruse of supposed payroll checks written to an employee. PSR, ¶ 9. The employee was not paid in this way however, did not deposit the checks written to him in his own account or anyone else's account and was simply used as a means to cash the check at Fast Cash. Thus, the employee would receive cash from Fast Cash and turn that cash over to Mr. Pollard, who would use it to keep the businesses afloat. Once Mr. Pollard got paid from his clients, he would deposit money to his business bank account and the cycle would be completed. None of the Fast Cash check money was ever reportable income to the employee, and Mr. Pollard has long since ceased this check conduct.

### (iv)   Rehabilitation

#### (a)   The Businesses Are Reformed

Mr. Pollard's personal characteristics are not limited to his childhood—they also include his present and future circumstances, including his efforts to make good on his past mistakes – in other words, rehabilitation. In addition to reaching an early resolution and accepting full responsibility for the payroll tax offense to which he has pleaded guilty, Mr. Pollard has entered into an agreement with the IRS to pay the back taxes and penalties that he owes for the relevant conduct in this case. PSR, ¶ 12.

He has also hired respected professionals to bring his businesses into full compliance. Mr. Pollard has hired Steven Katz, an attorney with the specialty tax firm Sideman & Bancroft, to contact the IRS and the EDD for all years post-offense. Bays Decl., Ex. G (Letter of Steven

8

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

Katz).  Mr. Katz states:

> Mr. Pollard engaged me in 2013 to assist him and his corporate entities in resolving their employment tax liabilities and ensuring compliance with federal and state tax laws.  Since my engagement by Mr. Pollard, he has made significant efforts to address his tax obligations.  He authorized me to contact both the Internal Revenue Service and the California Employment Development Department and to work with these tax authorities to ensure his compliance with applicable filing obligations and to establish appropriate payment arrangements to fully satisfy his tax obligations.

> We are presently working with the IRS to address payroll tax periods subsequent to the years [at issue in the criminal case] and are awaiting assignment to an IRS revenue officer to establish an appropriate monthly installment agreement to fully pay existing tax liabilities.  We have already established a payment agreement with the EDD for one of Mr. Pollard's entities and are on the verge of an agreement for the other entity.

*Id.*  Since Mr. Katz's letter was written, Mr. Pollard has reached agreements with EDD for SF Garage, Mercury Engineering, SF Eco Works and A-1 Inspection (owned by Mr. Pollard's sister, Rachel Abraham Pollard).

These agreements have required Mr. Pollard to sell his real estate assets, including his personal residence—properties that he acquired over the course of thirty plus years of work.  PSR, ¶¶ 49, 59.  On May 8, 2014, Mr. Pollard paid $100,000 from sales proceeds toward his restitution obligation and agreed to pay $25,000 each subsequent quarter, starting on June 30, 2014, until the criminal restitution is fully repaid.  PSR, ¶ 15; Bays Decl., Ex. H (Letter of Mary McNamara to IRS Agent, attaching $100,000 Cashier's Check).  The ongoing sales and Mr. Pollard's future business income will continue to pay restitution, as well as the tax obligations for other years for which Mr. Pollard has come into compliance under Mr. Katz's guidance.

In addition to tax attorney Katz, Mr. Pollard has hired a business manager (with a legal and tax background) who has done the following:

- Hired a CPA, not the offense-era bookkeeper to prepare all tax returns and review accounting staff work.  Unlike the bookkeeper, this CPA is empowered to prevent any irregularities.  All tax returns up to 2012 are now filed

- Properly classified all workers as employees and not independent contractors

- Administered payroll through independent companies who now run payroll and pay tax such that Mr. Pollard cannot use that money in his businesses

Bays Decl,. Ex. I, at 1-2 (Addendum Letter of Christine Wade).  The tax attorney, the business manager, and the CPA have created a comprehensive structure of compliance and rehabilitation for Mr. Pollard.   S*ee Pflum*, 556 F. Supp. 2d at 1264 (basing variance to probation, *inter alia*, on fact that defendant had "hired a local certified public accountant ... to organize and assist in bringing the business into compliance with reporting, withholding, and other requirements under state and federal laws").

Mr. Pollard wants to keep his workers employed and their families provided for.  As Mr. Powell writes, "he feels responsible for his employees, their growth, and their need to make a living…. His businesses provide a livelihood for many people and it is hard to see how they could continue to succeed without his hand-on supervision."  Bays Decl., Ex. A.  Christine Wade, Mr. Pollard's business attorney, has written to the Court to describe Mr. Pollard's work ethic in the face of the near-calamity of the Great Recession:

> I have worked closely with Mr. Pollard for the past two years.  In the course of that work, I have found him to be honest, forthright, and extremely hardworking.  I have more than once recommended him to clients and friends.  I have also seen the effect on him of the financial strain brought on by the recession.  While the economy has rebounded, like many businesses, the effects of the sudden drop in real estate values and all that accompanied it continue to affect [Mr. Pollard's businesses].
>
> Mr. Pollard's efforts to keep his companies going, keep his workers employed and pay off debts accumulated during the recession have been ceaseless.  He regularly works 14 hour days, 7 days a week.  Despite this demanding schedule, he will still regularly take the time to assist a client or friend with something as simple as relighting a pilot light.  I am continually impressed with his work ethic and strength of character.

Bays Decl., Ex. E.

There is no question that, if Mr. Pollard goes to prison, his businesses will fail and his employees will lose their jobs.  PSR Justification, page 2.  Business lawyer Christine Wade describes all of the functions and duties, from business development to dealing with the arcane

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

permitting process to construction planning that Mr. Pollard, and Mr. Pollard alone does for his businesses.  As she states, "[i]n Mr. Pollard's absence, even for a matter of weeks, the company would be unable to survive."  Bays Decl., Ex. I (Addendum Letter of Christine Wade).  Real estate investor Adam McNicol corroborates Mr. Pollard's Key Man status:

> John is the sole person developing new business, bidding on projects and is the only one with the deep relationships and experience throughout the city to obtain approvals for work.  John is literally the engine of the business.  Without John it will collapse and over 40 families will lose their paycheck.

Bays Decl., Ex. J (Letter of Adam McNicol).  Courts have considered a tax defendant's professional responsibilities a persuasive factor in favor of a non-custodial sentence.  *See, e.g., United States v. Tomko*, 562 F.3d 558 (3d Cir. 2008) (en banc) (affirming non-custodial sentence for defendant who failed to pay more than $225,000 in taxes, where defendant's imprisonment would jeopardize his company's credit, threatening the jobs of its 300-plus innocent employees).

### (b)    Family Support and Community Service

Despite their treatment of him as a child, Mr. Pollard supports both of his elderly parents. PSR, ¶ 39; Bays Decl., Ex. K (Addendum Letter of Jonathan Powell).  Without the $400 per month and cell phone that Mr. Pollard has been giving his mentally unstable mother (for the past twenty years), the mother would be down to her social security income, which does not cover her basic living expenses.  *Id*.  In addition, Mr. Pollard pays for the tuition, computers, books and clothing for his younger school-aged brothers, Sam, aged 17 and Silas, aged 14, who live in Vermont and otherwise would be home-schooled, to disastrous effect.  Sam has asked Mr. Pollard to move in with him while he attends the College of Marin three months from now, in August.  *Id.*  Mr. Pollard has paid for the education of most of his other siblings.  Bays Decl., Ex. D, at 2 (Letter of Veera Mylapore).  He pays for family reunions and gives generously whenever his siblings are in need.  Bays Decl,. Ex. C, at 1 (Letter of Leah Caitlin Pollard).  A prison sentence will cripple Mr. Pollard's ability to provide in these vital ways to his family because it will destroy his ability to bring in money from his businesses.

11

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

In addition to supporting his family, Mr. Pollard has always devoted considerable time, money, and effort to the community.  For example, Bevan Dufty, Director of the San Francisco Mayor's Office of HOPE (Housing, Opportunity, Partnerships, and Engagement), has written to the Court to describe Mr. Pollard's work in the creation of a shelter specifically for single, homeless women at risk of giving birth on the streets.  Bays Decl., Ex. L (Letter of Bevan Dufty).  As Mr. Dufty explains, from the moment that Mr. Pollard heard of the opportunity to help renovate the shelter in late 2012, "you would have thought we'd been chosen for an extreme home makeover show.  Plumbers, electricians and other skilled personnel rolled up their sleeves to lovingly and carefully improve the systems so that three moms and their infants could move into the building."  *Id.*  And, Mr. Pollard's commitment to the project did not stall when the renovation was completed—instead, Mr. Pollard and his staff have remained dedicated to the project, and "have been on-call and responded whenever a problem occurred."  *Id.*

> Throughout the past year, John and his staff have been on-call and responded whenever a problem occurred.  Catholic Charities has been incredibly grateful for John's generosity, and those who work with homeless women who are expecting say that these rooms, combined with four more in an SRO (for those with partners) have changed the landscape in terms of not having women deliver and then enter shelters.
>
> More recently, John is helping me find new space to locate the Homeless Youth Alliance (HYA) of the Haight Ashbury, which lost its 12-year lease on Haight Street.

*Id.*

Mr. Pollard also works with the San Francisco Human Services Agency, Family and Children's Services Division and First Place Youth, to develop housing and job opportunities for foster children.  Bays Decl., Ex. M (Letter of Hansa Patel).  He sits on the board and donates generously to the Sant Bani School, where although he was expelled, he found some solace in the midst of his traumatic childhood (his great friend and father-figure, Jonathan Powell, was a teacher at Sant Bani).  Susan Dyment, the school's Director of College Guidance, who has known Mr. Pollard "since he was in kindergarten," describes him as a "dynamic, determined

individual who has turned adversity to advantage for himself and many others in his family and the wider community."  Bays Decl., Ex. F.  As Ms. Dyment writes in her letter to the Court:

> Ours is a small private school with a strong feeling of community, and John has continued a close relationship with the school in his adult life, as a participant in school-related activities, a member of the board of directors, a very generous donor, and a good friend to many people who have known him as long as I have.
>
> John has had to develop his considerable talents with very little parent support.  His mother has been disabled throughout much of her life, barely able to look beyond her own needs for substantial periods of time.  His father has had many relationships and eight children, all of which have diffused his attention away from the necessities of John growing up. . . . I know [John] is not dangerous and he is truly unlikely to ever transgress this way again… He is not a bad man.  I know of and appreciate the good he has done for many people.  I am confident he will continue in those good ways if he is given the chance.

*Id.*

Courts have considered similar charitable works and community service as strong grounds for granting downward variances to probationary sentences in tax cases.  *See, e.g., United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009).  For example, in *United States v. Tomko*, the defendant had directed twelve subcontractors doing work on his multimillion dollar home to falsify invoices to show that the work was done at one of the defendant's company's job sites.  *Id.* at 561.  The defendant then wrote the renovation work on his luxurious home off as a business expense, resulting in more than $225,000 in losses to the government.  *Id.*  In affirming the district court's variance from the guidelines range of 12-18 months' imprisonment to issue a sentence of probation, the Third Circuit noted that the defendant had engaged in extensive pre-indictment charitable acts, such as holiday give drives and volunteering time at an inner-city daycare center, which "involved not only money, but also his personal time."  *Id.* at 565.  Here, as in *Tomko*, Mr. Pollard has consistently contributed his time, skills, and money to volunteering in his community, and he will continue to do so if given the chance.

//

//

**B.      Factors (2), (4), (5) & (6)      Retribution, Deterrence and the Avoidance of Disparity -- All Served By a Probationary Sentence Which is Permitted By The Sentencing Guidelines and Policy Statements**

Citing the sentencing factors of punishment, deterrence and the need to avoid sentencing disparity, the PSR recommends three months' custody and six months home detention.  PSR, Justification, page 2.  Under the guidelines, Mr. Pollard's conduct yields an adjusted offense level of 12, with a Criminal History Category of I, for a total guidelines range of 12-18 months' imprisonment, and falling in Zone C of the Sentencing Table.  Given the factors outlined above, and in light of Mr. Pollard's compelling personal history and circumstances, it is appropriate to consider a small variance to enable a non-custodial sentence of probation.  *See, e.g., Tomko*, 562 F.3d at 565 (affirming district court's variance of five offense levels from guidelines range of 12-18 months' imprisonment to sentence of five years' probation for first-time tax offender, and noting that the variance was "not substantial," as the defendant's sentence of probation was just twelve months below the low end of the Guidelines range).

**(i)      Punishment and Deterrence**

In weighing the factors of punishment and deterrence, courts look to whether a particular defendant must be "taught a lesson" via a prison sentence, as opposed to whether there is punishment enough in what the defendant has done in response to the prosecution and in the many collateral consequences of conviction.  Consistent with §3553(a)(2), if the circumstances reveal that the purposes of sentencing have been partially or fully achieved prior to imposition of sentence, a sentence within the guidelines range may be "greater than necessary" to fulfill those goals. *United States v. Gand*, 829 F. Supp. 699, 671 (S.D.N.Y. 1993).  Thus, in considering the purposes of sentencing, it is important to acknowledge the losses that Mr. Pollard already has suffered, as well as the efforts that he has taken to remedy his mistakes.

14

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

Mr. Pollard has had to sell his real estate assets—comprising his life savings and his home—to reimburse the government for its losses and to hire professionals to bring his businesses into full compliance with tax laws.  In *Pflum*, the court held that these things represent punishment:

> The seriousness of the offense is not lost in an extended term of probation, particularly when the defendant has already taken such significant and costly strides toward reform….  During a three-year term of probation, the defendant will be expected to cooperate with the IRS and comply fully with federal and state income tax laws and authorities, both in filing returns for past and present years and in making reasonable and regular payments of any properly determined tax liability, including any and all interest and penalties associated with the principal amounts. **This is not an insignificant punishment**, particularly considering the nature of the defendant's offenses, the length of probation, and his already demonstrated commitment to accepting full responsibility for his offenses.

*Pflum*, 556 F. Supp. 2d at 1265 (emphasis added).  The obligations that Mr. Pollard has undertaken to come fully into compliance have been as effective as any prison term in humbling him and ensuring that he will never repeat the same conduct again. *See, e.g., United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming non-custodial sentence of five years' probation for first-time offender guilty of tax evasion resulting in almost $100,000 in losses to the government, where defendant cooperated with authorities, began paying restitution long before sentencing, and had already suffered substantial financial and emotional consequences).

Compared to a probationary sentence on terms requiring Mr. Pollard to pay his restitution, keep his businesses afloat and perform community service, a short term of custody such as the three months recommended here advances no punitive or deterrent purpose.  Mr. Pollard is an intensely driven man with a puritanical work ethic.  *See* Bays Decl., Ex. E (Letter of Christine Wade) (explaining that Mr. Pollard "regularly works 14 hour days, 7 days a week").  If anything, requiring him to spend three months in a federal prison camp would be a reprieve from his workaholic life, with its demands of bringing in enough work for 40 plus employees, coping with a demanding set of clients and straining to pay years of back taxes.  Electronic monitoring,

15

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

too, would obstruct, not further Mr. Pollard's working to pay his restitution and other tax obligations. Such monitoring is appropriate where a defendant is in danger of reoffending absent the restrictions on his liberty imposed by an ankle bracelet. For Mr. Pollard, restricting his liberty will do nothing but restrict his ability to work – it will not protect society. Mr. Pollard is the Key Man in his operation. Without him, the businesses fail. *See* Bays Decl., Exs. I (Letter of Christine Wade), J (Letter of Adam McNicol) (noting that, without Mr. Pollard's day-to-day involvement, the businesses "will collapse and more than 40 families will lose their paycheck"). Most of Mr. Pollard's clients are residential property owners who work regular business hours and need the flexibility to meet their contractor in their off hours. There is no other person in the businesses who can fulfill this client relations role. *Id.* Client needs aside, electronic monitoring makes little sense for a person like Mr. Pollard. He lives a modest life focused primarily on work, then family, then community. Bays Decl., Exs. D (Letter of Veera Mylapore), K (Addendum Letter of Jonathan Powell), & M (Letter of Hansa Patel). He has no drug or alcohol problems. PSR, ¶ 54.

### (ii)   No Unwarranted Disparity Occurs from Imposition of Probation in this Case

With respect to disparity, it is only the *unwarranted* kind that must be avoided. 18 U.S.C. § 3553(a)(6) ("the need to avoid unwarranted sentencing disparity . . ..")

Numerous courts have granted variances and imposed non-custodial sentences for defendants involved in similar—and sometimes more serious—offense conduct. For example, in *United States v. Pflum*, 556 F. Supp. 2d 1254 (D. Kan. 2008), the defendant pleaded guilty to tax evasion, with a total tax loss of $214,871 and a similar guidelines range of 12 to 18 months' imprisonment. Reviewing the 3553(a) factors, the court noted that the defendant had been heavily influenced by his father, a tax protester, and that the father's influence was an important factor to consider in evaluating the defendant's conduct. *Id.* at 1263-64. The court also noted that, after the offense, the defendant had hired an accountant and had taken "significant strides"

in bringing his business into full compliance with reporting, withholding, and other requirements under state and federal laws." *Id.* at 1264.  Finally, the court also noted that the defendant was crucial to the success of his company; without him, the company "would have to lay off employees and eliminate substantial health care benefits currently furnished to employees and their families." *Id.*  After reviewing these factors, the court held that a probationary sentence—a variance of five offense levels—was sufficient but not greater than necessary to serve the sentencing goals.  *Id.*  As the court explained, "the seriousness of the offense is not lost in an extended term of probation, particularly when the defendant has already taken such significant and costly strides toward reform."  *Id.*

Similarly, in *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009), the court affirmed a non-custodial sentence for a plumber who had engaged in various schemes to avoid paying taxes, including by directing subcontractors to submit falsified billing information.  The defendant had failed to pay over $225,000 in taxes, resulting in a guidelines range of 12 to 18 months' imprisonment.  In affirming the district court's sentence of three years' probation with restitution and community service—reflecting a variance of five offense levels—the appellate court focused on several factors: *First*, the defendant had previously volunteered his professional services for Habitat for Humanity, and he wished to engage in community service in lieu of imprisonment to help rebuild the Gulf Coast after Hurricane Katrina; *second*, if the defendant were imprisoned, his company would lose its line of credit and likely fail, threatening the livelihoods of its 300-plus innocent employees; and, *third*, the defendant had exhibited extraordinary acceptance of responsibility, going to great lengths to reimburse the government for the taxes he owed.  *Id.*  In light of these compelling factors, the appellate court affirmed the sentence as an appropriate exercise of the district court's discretion.  *Id.*

Defendants convicted of other tax offenses, often involving greater sums of money and the use of complex schemes or offshore accounts, have been granted non-incarceration sentences.  *See, e.g., United States v. Warner*, Case No. 13-CR-00731 (N.D. Ill. 2014)

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

(sentencing defendant to two years' probation and community service where defendant's offshore tax evasion scheme resulted in more than $5 million in losses to the U.S. Treasury); *United States v. Reiss*, Case No. 11-668 (S.D.N.Y. Jan. 11, 2012) (sentencing defendant to three years' supervised release, significant community service, and monetary penalties where defendant's tax evasion scheme resulted in more than $450,000 in losses to the U.S. Treasury); *United States v. Olenicoff*, Case No. 07-227 (C.D. Cal. 2008) (sentencing defendant to two years' probation where defendant controlled and his assets in undisclosed offshore and foreign accounts resulting in tax liability to the IRS totaling $52 million); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming variance to non-incarceration, probationary sentence where defendant's tax evasion scheme had resulted in almost $100,000 of losses to the U.S. Treasury and guidelines range called for sentence of 10 to 16 months' imprisonment).  In offering these examples, Mr. Pollard does not seek to downplay the wrongfulness of his conduct, but only to offer data points by which the Court may fashion an appropriate sentence given his own personal history.

Here, just as in *Pflum* and *Tomko*, Mr. Pollard has compelling personal circumstances, including a childhood with an almost complete lack of parental guidance; he has made great efforts to reimburse the government for its tax losses; and, if granted a variance for a non-custodial sentence, he will continue to support his many employees and their families, while also supporting his own family and volunteering his time in his community.

In short, a probationary sentence for Mr. Pollard, if a disparity at all, would constitute a warranted disparity, entirely permissible under Section 3553(a)(6).

//

//

//

//

### C.   Factor (3)   Probation Is Both Statutorily Available And Readily Permissible Under the Guidelines

#### (i)   A Non-Custodial Sentence Constitutes A Modest Variance Well-Supported By Case Law

The Court has full authority to issue a variance from the Guidelines in this case and sentence Mr. Pollard to a non-custodial, probationary sentence.  As set forth above, under strikingly similar circumstances, the Third Circuit described a nearly identical variance from a guidelines range of 12-18 months' imprisonment to a non-custodial sentence as "not substantial." *Tomko*, 562 F.3d at 563.  In *Tomko*, the defendant pleaded guilty to tax evasion after he directed subcontractors working on his home to falsify information on billing invoices, resulting in more than $225,000 in losses to the government.  *Id.* at 562.  The district court varied downward five offense levels to a sentence of probation, citing the defendant's personal history, acceptance of responsibility, and "exceptional charitable work" as support for the sentence.  *Id.* at 563.  On appeal, the Third Circuit affirmed, noting that "it bears mentioning that <u>the district court's variance here was not substantial</u>," as the difference between the low end of the guidelines range and the defendant's actual sentence was <u>only twelve months</u>.  *Id.* (emphasis added).  After reviewing the facts of the case, including the defendant's acceptance of responsibility, lack of criminal history, extensive charitable works, and prominence and importance to his company and its employees, the court affirmed the sentence of probation, holding that the district court had not abused its discretion. *Id.*  Here, as in *Tomko*, Mr. Pollard has no countable criminal history; has taken extraordinary measures to accept responsibility for his actions and compensate the government for its losses; plays a crucial role in the success of his companies and the livelihood of his employees; and has volunteered considerable time and effort to his family and community.

#### (ii)   Imposition Of A Community Service Requirement Is Appropriate.

In fashioning an appropriate non-custodial sentence, the Court may impose applicable conditions such as community service, acknowledging Mr. Pollard's deep and lasting efforts to

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

contribute to his community in a positive way.  The Administrative Office of the U.S. Courts has described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community.  It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved."  *See* ADMINISTRATIVE OFFICE OF THE U.S. COURTS, OFFICE OF PROBATION & PRETRIAL SERVICES, *Court & Community* (2007).  As the Administrative Office has explained, "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation" by (1) "restrict[ing] offenders' personal liberty and requir[ing] them to forfeit their leisure time" (2) "allow[ing] offenders to atone or 'make the victim whole' in a constructive way"; (3) serving as a form of "symbolic restitution when the community is the victim"; and (4) "foster[ing] a sense of social responsibility in offenders and allow[ing] them to improve their self-image through serving the community."  *Id.*; *see also United States v. Shamilzadeh*, Case No. 04-CR-194 (E.D.N.Y. 2008) (sentencing transcript) ("Alternatives to incarceration exist that can carry both the community's and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case...  The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.").

Here, a probationary condition of community service would build on Mr. Pollard's earlier and continuing efforts to improve his community through service and volunteer work, including by volunteering to renovate a shelter for single, homeless mothers and working to teach practical, job-related skills to adolescents.  Such a requirement would allow Mr. Pollard to rehabilitate himself and further atone for his wrongful conduct by continuing to improve the lives of those around him.

//

//

//

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

### D.    Factor (7)    Only A Probationary Sentence Satisfies The Need To Provide Restitution

Mr. Pollard has already taken significant steps to compensate the government for its tax losses, and to pay the employee portion of the payroll tax, thus remedying the tax debts of his employees.  PSR, ¶ 10.  He has sold real estate assets that he has acquired over a lifetime of work.  Unfortunately, the sale of his assets, while substantial, will finance only a part of the required payment.  His financial disclosures show that Mr. Pollard is deeply in debt to the government.  PSR, ¶58.  Mr. Pollard can pay what he owes to the government only if he continues to earn money through his ongoing businesses.  Mr. Pollard has the ability to pay $25,000 per quarter to pay off his restitution obligation in this criminal tax case.  Because he still owes $206,854[5] in unpaid taxes and penalties under his civil closing agreement with the IRS, it will take him two years to fully pay off his restitution.

Locking Mr. Pollard up even for a short time, will destroy his businesses, idle his workers and stop the flow of restitution and tax payments to the government.  *See* Bays Decl., Ex. I ("In Mr. Pollard's absence, even for a matter of weeks, the company would be unable to survive."), Ex. J (noting that, "without John Pollard's in person daily management the business will collapse … and over 40 families will lose their paycheck").  Courts view such circumstances as supporting variances in tax cases.  *See, e.g., Pflum*, 556 F.3d at 1264 (approving variance of non-custodial sentence for tax evasion and noting as persuasive that, without defendant's contributions, his business "would have to lay off employees and eliminate substantial health care benefits currently furnished to employees and their families"); *Tomko*, 562 F.3d at 572 (affirming variance of non-custodial sentence for tax evasion where, "because of [defendant's] prominence in the company, his incarceration would threaten the jobs of [his] over 300 employees").

---

[5]    Per his civil closing agreement, Mr. Pollard owed a total of $306,854 in tax and penalties for tax year 2009.  PSR, ¶ 12.  On May 8, 2014, he paid $100,000.  Accordingly, Mr. Pollard's remaining balance is $206,854.

**Defendant John Clifford Pollard's Sentencing Memorandum and Motion for Downward Variance**
*United States v. Pollard*, CR 13-722 WHO

III.   **CONCLUSION**

A probationary sentence is sufficient but not greater than necessary to serve federal sentencing goals.  Were Mr. Pollard in need of punishment to demonstrate the seriousness of his offense or of deterrence to prevent a criminal relapse, the PSR's suggested custody and electronic monitoring would be appropriate sentencing tools.  But, Mr. Pollard offended largely out of a combination of extreme disorganization and ingrained attitudes toward authority learned as a neglected child.  Those two afflictions are now solidly in remission, a remarkable achievement given Mr. Pollard's background.  Mr. Pollard is in lockstep toward full restitution for the 2009 tax year and he has come into full compliance for all subsequent years with an enormous tax bill that will take him the rest of his life to pay.

What happens to Mr. Pollard affects not just him, but his parents, for whom his financial support is the difference between having a home and not, his younger brothers, who will suffer the same educational catastrophe as Mr. Pollard without receiving stipends from him, and his forty employees, who depend on his businesses for their livelihoods.

Imposition of even a brief period of custody and the restriction of an ankle bracelet serves no useful purpose in this case – these measures simply get in the way of Mr. Pollard's making amends for his offense.  It is far more important that Mr. Pollard keep his businesses afloat, his employees at work, his family intact and the tax authorities paid than it is for him to be warehoused at a net cost to society.  It sometimes happens that the experience of being prosecuted can change a person's life.  For Mr. Pollard, whose education was received entirely in the School of Hard Knocks, such is the case.


Dated:  May 22, 2014                     Respectfully submitted,


                                         _____/s/_____
                                         Mary McNamara
                                         Nathan Bays
                                         SWANSON & McNAMARA LLP
                                         Attorneys for JOHN CLIFFORD POLLARD

22