Mary McNamara, SBN 147131
mary@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for JOHN CLIFFORD POLLARD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN CLIFFORD POLLARD,<br><br>Defendant. | Case No. CR 13-722 WHO<br><br>**DEFENDANT JOHN CLIFFORD POLLARD'S SENTENCING MEMORANDUM ON AMENDED PETITION FOR SUMMONS -- FORM 12**<br><br>Date: August 18, 2016<br>Time: 1:30 p.m.<br>Court: Hon. William H. Orrick |

## I. INTRODUCTION

On April 14, 2016, John Pollard struck a car that was attempting to leave a parking space in front of Mr. Pollard's business. The car was being driven by an employee at the time and Mr. Pollard deliberately hit the car with the employee in it. Before this incident, Mr. Pollard had been performing extremely well on probation supervision (imposed on May 8, 2014).

Mr. Pollard knows full well that this Court took a chance on him when it gave him a reduced sentence over two years ago. The Court exercised lenience based in part on its view that he was a hard-working man who did community work, and who would strive to redeem himself from his tax offense. What makes Mr. Pollard's behavior in this incident so disappointing is the distance that he had come in

doing just that – he had repaid the criminal tax restitution, he had also paid all of the civil penalties and interest from the offense of conviction, and he was well on his way to paying off personal and business tax debts that he had owed for other years. His business was fully compliant with payroll tax withholding, he was employing 90 people (up from 46 in 2013) building houses in a city where construction is often a challenge. Through it all, he was continuing his community work, as verified by former Supervisor Bevan Dufty, and he was supporting his family.

On April 14, 2016, Mr. Pollard blew a hole in all of that progress. There is no dispute that Mr. Pollard can at times be loud and unpleasant with employees, but he has never before acted out physically or violently. April 14 was a stark exception. The explanation for the physical acting out lies in a combination of 1) extraordinarily stressful events – Mr. Pollard had received news that threatened the survival of his business – and 2) Mr. Pollard's compromised coping skills due to childhood trauma. Mr. Pollard is ashamed of his actions and deeply remorseful. As set forth below, he is determined through therapy to address the root causes.

There is also no dispute that Mr. Pollard was dishonest with the police in the aftermath. But, it is submitted that that reaction does not make Mr. Pollard a deceptive person who must be incarcerated in order to teach him the value of honesty. Shortly after the incident and without prompting by the Court or the Probation Officer, he went into psychotherapy and has admitted the full scope of his conduct to his therapist. He has also admitted his conduct publicly to this Court. His therapist explains that Mr. Pollard's initial denials were the result of a combination of feelings of shame, fear of the legal consequences (Mr. Pollard is acutely aware of the need to prove himself to this Court) but most of all, damage from Mr. Pollard's childhood. That is something that Mr. Pollard will have to work long and hard to overcome. He is doing that through both psychotherapy and, at the recommendation of his therapist, additional, intensive treatment in the form of cognitive behavioral therapy. In combination, these treatments require three and a half session hours every week for the foreseeable future.

The defense agrees with both the government and the United States Probation Officer that Mr. Pollard's conduct calls for sanction. The defense further agrees that Mr. Pollard's probation should be extended and that his current participation in weekly psychotherapy as well as weekly cognitive behavioral therapy be formalized as required conditions of his probation. However, the defense submits

**DEFENDANT'S MEMORANDUM ON FORM 12 VIOLATION**

that incarceration would not serve a useful purpose here. Mr. Pollard's participation in 3.5 hours of mental health treatment every week offers the best chance of ensuring that something like this never happens again. Continuing Mr. Pollard on probation for an extended period is a sufficient additional punishment – it creates real restriction on his freedom, keeps him under a microscope where his every move can be supervised, but it also allows him continued rehabilitation so that he can get the treatment he needs, while maintaining his business and supporting his family and his employees. Alternatively, the defense suggests that the Court impose a suspended jail sentence, such that if Mr. Pollard violates his probation again, the suspended sentence would be executed immediately, in addition to any sanction for such new violation. The defense submits that both of these suggestions fulfill the directive of Section 3553, to impose a sentence necessary but no more than sufficient to achieve sentencing goals.

## II. FACTS

John Pollard is 49 years old. Other than the April 14 incident, he has no history whatsoever of violence. It is undisputed that Mr. Pollard can become loud when frustrated, but he has never before gone past words. His sister, Veera Mylapore states that "I've never known him to attempt to hurt or be a threat in any way to another person. He can have a strong reaction when he gets upset, but it is a case of his 'bark is stronger than his bite' – he makes a loud commotion at times, but has never and would never go beyond this to the physical realm." Letter of Veera Mylapore, dated August 11, 2016, a true and correct copy of which is attached to the Declaration of Mary McNamara ("McNamara Dec.") as Exh. B. His fiancée and colleague, Annabel McClellan, who has been in a relationship with Mr. Pollard for two years and worked for him for almost three, states that "[W]hile John can easily become impatient and exasperated with issues that arise at work, and he can sometimes be short and unpleasant with employees, there is nothing remotely violent or aggressive about him." Letter of Annabel McClellan, dated August 11, 2016, a true and correct copy of which is attached to the McNamara Dec. as Exh. C, at 2. As to calling employees derogatory names (Gov. Sent. Memo at 3), Ms. McClellan who works closely with Mr. Pollard and the employees in the office, says "I have never heard John calling anyone what I would consider a derogatory name. He does use the word 'knucklehead,' often against himself. And, while I have heard him raise his voice in frustration at employees, it is not a frequent occurrence. He does tend to use sarcasm, as do I, and John can be very direct, but it is not usually directed at a

**DEFENDANT'S MEMORANDUM ON FORM 12 VIOLATION**

person, more at a situation. Overall, in the rough and tumble world of construction, where a thousand things are in flux and where Murphy's law can sometimes appear to be the only law, John is a really good employer who is big-hearted and generous with his employees." *Id*.

While imperfect, nothing about Mr. Pollard's temperament in the workplace explains what he did on April 14. To understand that and to deal with the eruption of latent anger that burst out, Mr. Pollard started psychotherapy with Scott Lines, Ph.D, described in more detail in Section III. Dr. Lines believes that Mr. Pollard was dealing with an unusually intense combination of situational stressors on the day of the incident and that that stress overwhelmed emotional infrastructure that had been damaged during his traumatic childhood. Letter of Scott Lines, dated August 5, 2016, filed as Exh. A with a request for sealing, at 1-2.

Even before April 14, the day to day stresses in Mr. Pollard's work were taking a toll: "our business is extremely stressful, managing our clients, projects and employees with ever changing schedules and issues. Since 2013 we have grown from 46 to 90 employees and almost doubled our revenue. . . . John's days are a blur of constant phone calls, emails, job-site inspections, client meetings and plan review. The responsibility of selling new business rests solely with John and evenings and weekends are often filled with potential client meetings. Coupled with our on-going efforts to finalize the past IRS issues, stress levels are routinely high." Exh. C at 2. On April 14 however, Mr. Pollard's stress level had reached a breaking point. Mr. Pollard had received word earlier that week of a threatened hold on approval of a vital line of credit, threatening the survival of the business. He "was under a great deal of emotional strain." Exh. A at 1. The circumstances were that the bank (which had taken a risk after Mr. Pollard disclosed his felony conviction and probation status), had notified Mr. Pollard that it was going to put a hold on approving a line of credit necessary to make payroll. This was because the bank had learned that the IRS had placed new liens on the business and on Mr. Pollard personally for the 2009 tax year. Exh. C at 3. The 2009 tax year was the year involved in Mr. Pollard's criminal case. He had paid off all tax liability, penalties and interest for that year (part of the civil compromise that Mr. Pollard has reached with the IRS). The IRS had just notified Mr. Pollard that it did not credit $150,000 of those payments and, when Ms. McClellan provided proof of the payments, the IRS officer advised that it would take weeks to sort the issue out. On top of this, a closing on a property

**DEFENDANT'S MEMORANDUM ON FORM 12 VIOLATION**

-4-

on which the business was owed a significant amount of money was in jeopardy. *Id.* As Ms. McClellan puts it, "it looked like everything we had been working so hard for was going to fail." *Id.*

This was the context when Mr. Pollard, driving a company Ford Scion, returned to the business late in the morning of April 14, and "simply lost control of himself." Exh. C at 3. He found the entrance blocked by another company Ford Scion that was parked there. That small inconvenience caused Mr. Pollard to crack. He repeatedly hit the parked Scion with the car that he was driving. Although accounts appear to differ as to whether the victim was in the car for all of the times that Mr. Pollard struck the other car (witnesses suggest that he was, but both the victim and Ms. McClellan say that the victim was in the car for the last strike and not the others – Amended Form 12 at page 4; Exh. C at 3), there is no dispute that Mr. Pollard intentionally hit the victim's car with his own. Nor is there a dispute that Mr. Pollard was untruthful to the police in the aftermath.[1]

The root of both behaviors lies in Mr. Pollard's childhood of neglect and abandonment.

### III. Mental Health Treatment

Almost immediately after the April 14 incident, Mr. Pollard sought weekly psychotherapy treatment with Dr. Scott Lines. The therapy focuses on his anger, from the perspective of present-day behavioral control and from the perspective of underlying precursors stemming from his past. Exh A. at 1. In addition, on Dr. Lines's recommendation, Mr. Pollard has enrolled in intensive weekly cognitive behavioral therapy, which has both group and one-on-one components. Combined, Mr. Pollard is now in 3.5 hours of mental health treatment every week.

Dr. Lines notes that, in psychotherapy, it has taken time for Mr. Pollard to "truly face, accept and analyze what he did." This is in part because rapidly escalating stress hormones blur understanding at

---

[1] While the government believes that the representation made to the Court that the damage to the vehicles was $500 constituted a further effort to downplay the incident (Gov. Sent. Memo at 2), the damage in fact cost $259.04 for one of the company cars and $126.12 for the other. Letter of Gina Weyant, a true and correct copy of which is attached to McNamara Dec. as Exh D. This is because Ford Scions are relatively inexpensive cars and the replacement parts were after-market items of low cost. The City of San Francisco has submitted no claim for damage to the third car, which was struck by the Scion driven by the employee in a knock-on impact from Mr. Pollard's bashing of the employee Scion.

**DEFENDANT'S MEMORANDUM ON FORM 12 VIOLATION**
-5-

the time of the anger event, and after the person calms down, there is a desire to minimize the unacceptable behavior. In Mr. Pollard's case, there was the added anxiety of his probationary status and his recognition that he was in serious trouble with this Court. Ms. McClellan notes that Mr. Pollard, the victim employee and she herself all reacted "out of a place of fear" when the police arrived. Exh C at 3. But, most of all, Mr. Pollard's conduct is the product of a childhood of "abandonment [which] cause[d] him to try to distance himself from unpleasant and painful feelings." Exh. A at 1. Dr. Lines reports that Mr. Pollard's default emotional response is to try to gloss over painful thoughts or events, including the very real possibility of jail as a result of this incident, by trying not to dwell on painful facts. Dr. Lines has therefore recommended an additional component to Mr. Pollard's treatment, known as Dialectical Behavior Therapy, a mode of cognitive behavioral therapy that emphasizes the psychosocial aspects of treatment. The DBT therapist teaches adaptive behaviors, giving the patient tools to cope with stressors. Mr. Pollard "is showing progress in opening up to memories of his neglectful childhood," and "is willing to do the work that he needs to do to change his reaction to stress and make it more manageable and less damaging to himself and those around him." Dr. Lines concludes that DBT, in combination with his weekly psychotherapy, "is an excellent path forward for Mr. Pollard and the one most likely to effect real change in him." Exh. A at 1. The combination of psychotherapy and DBT results in a total of 3.5 hours of mental health therapy per week (one hour psychotherapy with Dr. Lines, 1.5 hours of group DBT therapy and one hour of one-on-one therapy with a DBT instructor learning adaptive skills).

## IV    SENTENCING RECOMMENDATION

The Court's initial probationary sentence recognized the good qualities in Mr. Pollard's character and challenged him to prove to the Court that he could redeem his payroll tax evasion crime, implement reforms and operate his business in full compliance with tax laws while making full restitution, all while supporting his family and continuing good works in the community. Mr. Pollard met those challenges and submitted periodic status reports apprising the Court of his progress. *See* Dkt. 20, 22. However, Mr. Pollard failed to address serious mental health problems that lay dormant, but that came to the fore in an intense eruption during a week of unusually high stress. The result was a serious incident where Mr. Pollard used his car to act out his frustration without regard to the safety of one of his own employees. It was a frightening loss of control and it requires a serious response.

**DEFENDANT'S MEMORANDUM ON FORM 12 VIOLATION**

It is submitted that Mr. Pollard's response has been serious. Almost immediately after the incident, without being told to do so by the Probation Officer or the Court, he threw himself into difficult and challenging mental health treatment, requiring him to relive the trauma of childhood. He also took an anger management class at Kaiser, his health care provider. Having made progress with psychotherapy, he has now followed his therapist's recommendation of additional therapy with a specialist provider in Oakland. The combined package of psychotherapy and cognitive behavioral therapy is, in the opinion of Dr. Lines an excellent path forward and one capable of changing Mr. Pollard. Exh. A at 1.

It is submitted that Mr. Pollard is not a violent or a deceptive person. On April 14, he lost control of himself and repeatedly collided with another company car. Even as his employee was attempting to clear a space for him, Mr. Pollard crashed into the car again, indifferent to the risk to his employee. It was a shocking event that seemed to come out of nowhere. Mr. Pollard is intensely remorseful and ashamed of what he has done. He is not however a danger to anyone, and given the seriousness with which he is dealing with his mental health, heis likely more attuned now to the effects of stress on his personality than ever before. Dr. Lines sums Mr. Pollard up as follows: "I believe that Mr. Pollard is a basically well-intentioned person who works too hard, places too much pressure on himself and, until now, has not been able to get the help that he needs to deal with the damage from his childhood." Exh. A at 2. Mr. Pollard is truly a generous and kind person. A good example of this is the fact that he hired the victim employee while the victim was on probation for a serious drug felony. Exh C at 2-3. Even the bank that had threatened to hold approval of the line of credit (it relented on understanding the IRS situation) has written a letter to the Court attesting to Mr. Pollard's basic honesty. The Sterling Bank & Trust VP of Commercial Real Estate, whom Mr. Pollard told about his criminal conviction, writes that Mr. Pollard's conduct was not the "reapings of an inherently dishonest or selfish individual," and Mr. Pollard "has the trust of myself as well as the Bank's Management and Ownership." Letter of Nathan LaBudde, a true and correct copy of which is attached to McNamara Dec as Exh. E. Ms. McClellan speaks of Mr. Pollard's having "embraced the role of father figure" to her children, teaching them skills, helping them with college applications and cooking together every evening. Exh. C at 2. Ms. McClellan also states: "I cannot tell you how seriously he stakes his

**DEFENDANT'S MEMORANDUM ON FORM 12 VIOLATION**

probation status – his first priority is to prove to the court that he was worth taking a risk on. He is deeply ashamed of his conduct and will move heaven and earth to make up for what he did." *Id.* at 4. And there are Mr. Pollard's good works in the community, which he continues to undertake, all the other obligations in his life notwithstanding.

In light of the totality of these circumstances, the defense submits that Mr. Pollard's probation be extended by one year, with formal conditions that he engage in weekly psychotherapy and weekly cognitive behavioral therapy and that he be required to report back to the court on a periodic basis. It is submitted that the intensive mental health treatment alleviates the need for a continued driving restriction. In the alternative, the defense suggests that the Court could impose a suspended jail sentence, such that if Mr. Pollard violates his probation again, the suspended sentence would be executed immediately, in addition to any sanction for such new violation. In either case, the sentence would better address the root causes of Mr. Pollard's behavior, offer the best protection to the community and keep intact the significant progress that Mr. Pollard has made in all other aspects of his rehabilitation.

Dated: August 11, 2016                                          Respectfully submitted,

                                                                 /s/                                    .
                                                                Mary McNamara
                                                                SWANSON & McNAMARA LLP
                                                                Attorneys for JOHN POLLARD